UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| L.C.S., a minor, by her father, | ) | |
| JEREMY W. SPENCER, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:11-cv-00251-SEB-MJD |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of the | ) | |
| Social Security Administration, | ) | |
| Defendant. | ) | |

**ENTRY**

Jeremy W. Spencer brought this action on behalf of his minor daughter, L.C.S., seeking judicial review of the Commissioner=s final decision denying his June 12, 2007 application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. ' 1382c(a)(3), alleging that L.C.S. had a disability onset date of June 1, 2006. (R. 10).   After a hearing, the ALJ found that L.C.S. was not disabled as of the date of her application. Id.   On February 2, 2011, the Appeals Council denied Mr. Spencer=s request for review of this decision (R. 1-3) thereby making the Commissioner=s decision final for purposes of judicial review. 20 C.F.R. ' 416.1481.   Mr. Spencer asserts that the decision denying his minor daughter the supplemental benefits was not supported by substantial evidence and requests that the Court remand the case to the Commissioner. For the reasons detailed herein, we deny his request and affirm the decision of the Commissioner.

## I.   Applicable Law and Standard of Review

Judicial review of the Commissioner's factual findings is deferential: courts must affirm if the findings are supported by substantial evidence in the record. 42 U.S.C. 405(g); Skarbek v. Barnhart, 390 F.3d 500, 503 (7th Cir.2004); Gudgel v. Barnhart, 345 F.3d 467, 470 (7th Cir.2003).   Substantial evidence is more than a scintilla, but less than a preponderance of the evidence. Wood v. Thompson, 246 F.3d 1026, 1029 (7th Cir.2001). If the evidence is sufficient for a reasonable person to conclude that it adequately supports the Commissioner's decision, then it is substantial evidence. Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); Carradine v. Barnhart, 360 F.3d 751, 758 (7th Cir.2004). This limited scope of judicial review reflects the principle that Congress has designated the Commissioner, not the courts, to make disability determinations: AIn reviewing the decision of the ALJ, we cannot engage in our own analysis of whether [the claimant] is severely impaired as defined by the SSA regulations. Nor may we reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute our own judgment for that of the Commissioner. Our task is limited to determining whether the ALJ's factual findings are supported by substantial evidence.@   Young v. Barnhart, 362 F.3d 995, 1001 (7th Cir.2004); Carradine, 360 F.3d at 758.   While review of the Commissioner's factual findings is deferential, review of his legal conclusions is *de novo. Richardson, supra.*

An individual under the age of eighteen is eligible for disability benefits under the Supplemental Security Income (ASSI@) program of the Social Security Act, 42 U.S.C. ' 1381 *et seq.*,[1] if she Ahas a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.@ 42 U.S.C. ' 1382c(a)(3)(C)(I).  A physical or mental impairment is one that results from anatomical, physiological, or psychological abnormalities that are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. Id. ' 1382c(a)(3)(D).  In determining whether impairments are disabling, the combined effect of all of the child's impairments must be considered, without regard to whether any single impairment alone is of disabling severity. 42 U.S.C. ' 1382c(a)(3)(G).

By regulation, the Social Security Administration (ASSA@) has determined that satisfaction of one of the Medical Listing of Impairments ("Listing"), 20 CFR Part 404, Subpart P, Appendix 1, Part B, fulfills the statutory requirement that a child's impairment or combination of impairments Aresults in marked and severe functional limitations.@ The Listing, Part B, is a compilation of medical conditions, divided into fourteen major body systems, that the SSA has pre-determined are disabling in children. 20 CFR ' 416.925.  In

---

[1]  Two programs of disability benefits are available under the Social Security Act: Disability Insurance Benefits (ADIB@) for persons who have achieved insured status through employment and withheld premiums, 42 U.S.C. ' 423, *et seq.,* and Supplemental Security Income benefits (ASSI@) for uninsured individuals who meet income and resources criteria, 42 U.S.C. ' 1381, *et seq.* A minor can be eligible for disability benefits under only the SSI program.

general, each listed condition is defined by two sets of criteria: diagnostic findings that substantiate the existence of a listed condition and sets of related functional limitations that substantiate the condition's disabling severity. Id.

A child's impairment or group of impairments can satisfy a listed condition in any of three ways: by meeting all the listed criteria for the condition, 20 CFR ' 416.925(c)(3); by medically equaling the criteria, id. ' 416.925(c)(5); or by functionally equaling the criteria, id. ' 416.926a(a).   A child's impairment *meets* a listed condition only when it satisfies all of the criteria of the listing. 20 CFR ' 416.925(c)(3) and (d).   A child's impairment *medically equals* a listed condition when it is at least equal in severity and duration to the criteria of a listed condition. Id. ' 416.926(a).   Medical equivalence will be found when (1) the child's impairment, though listed, is lacking one or more of the medical or severity criteria, but other findings related to the impairment are of at least equal medical significance to the listed criteria, id. ' 416.926(b)(1); (2) the child's impairment is not a listed condition but the impairment's medical and severity findings are of at least equal medical significance to a closely analogous listed condition, id. ' 416.926(b)(2); or (3) the child has a combination of impairments, no one of which equals a listed condition, but the impairments' medical and severity findings are of at least equal medical significance to a listed condition, id. ' 416.926(b)(3).

A child's impairment or combination of impairments will *functionally equal* a listed condition when it is of listing-level severity, meaning that it results in a Amarked@ limitation

in two domains of functioning or an Aextreme@ limitation in one domain. 20 CFR '
416.926a(a). The domains of functioning are (1) acquiring and using information, (2)
attending to and completing tasks, (3) interacting and relating with others, (4) moving
about and manipulating objects, (5) caring for self, and (6) health and physical well-being.
Id. ' 416.926a(b)(1).   The SSA has defined constituent activities within each domain and
their normal levels of performance at different age groups. Id. ' 416.926a(g)-(l).   In
general, a Amarked@ limitation exists when a child's impairment or combination of
impairments Ainterferes seriously with [her] ability to independently initiate, sustain, or
complete activities@ within a particular domain. It is a limitation that is Amore than
moderate@ but Aless than extreme,@ and is the level of functioning that is expected with
scores that are more than two, but less than three, standard deviations below the mean on
standardized tests. Id. ' 416.926a(e)(2).   An Aextreme@ limitation is one that interferes
Avery seriously@ with a child's ability to perform activities within a domain.   It is Amore
than marked,@ and is the level of functioning that is expected with scores at least three
standard deviations below the mean on standardized testing. Id. ' 416.926a(e)(3).

SSA has established a three-step sequential process for evaluating child-disability
claims. 20 CFR ' 416.924. If disability eligibility can be determined at any step in the
sequence, an application will not be reviewed further. Id. ' 416.924(a).   At the first step, if
the child is engaged in substantial gainful activity, *i.e.,* is earning money, then she is not
disabled. Id. ' 417.924(b).   At the second step, if the child's impairments are not severe,

then she is not disabled.   A severe impairment or combination of impairments is one that causes Amore than minimal functional limitations.@ Id. ' 416.924(c).   Third, the child's impairments, either singly or in combination, must satisfy the criteria of at least one of the conditions included in the Listing of Impairments. Id. ' 416.924(d).   If a child's impairments pass all three steps, and satisfy the duration requirement, then she is deemed disabled.

An application for benefits, together with any evidence submitted by the applicant and obtained by the agency, undergoes initial review by a disability examiner and a physician or other appropriate medical specialist. If the application is denied, the applicant may request reconsideration review, which is conducted by different disability and medical experts.   If denied again, the applicant may request a hearing before an administrative law judge (AALJ@).[2]   An applicant who is dissatisfied with the decision of the ALJ may request SSA's national Appeals Council to review the decision.   If the Appeals Council either declines to review or affirms the decision, then the claimant may file an action in district court for judicial review. 42 U.S.C. ' 405(g).   If the Appeals Council declines to review a decision, then the decision of the ALJ becomes the final decision of the Commissioner for judicial review.

---

[2]   Initial and reconsideration reviews in Indiana are performed by an agency of the state government-the Disability Determination Bureau, a division of the Indiana Family and Social Services Administration, under arrangement with the Social Security Administration (SSA). 20 C.F.R. Part 404, Subpart Q (' 404.1601 *et seq.*).   Hearings before ALJs and subsequent proceedings are conducted by personnel of the federal SSA.

## II. Claimant=s Background

### A.   Treatment in 2006

In March 2006, when she was six-and-a-half years old, L.C.S. was assessed by Dr. Dana Hiller, a pediatrician at Wishard Hospital.   Dr. Hiller documented that L.C.S. ate Aeverything@ and occasionally ate from the garbage; she observed that L.C.S looked Asad@ and wondered if L.C.S.=s eating may be due to stress or depression.   Dr. Hiller suggested counseling. (R. 217).   In a follow-up visit on May 15, 2006, Dr. Hiller noted that L.C.S. had bowel movement problems with liquid stool in her perineal area. (R. 216).   Mr. Spencer, L.C.S.'s father, had not yet contacted a mental health provider according to the hospital visit note. (Id.) Dr. Hiller also noted that L.C.S. bathed and used the toilet independently. (Id.)   She diagnosed L.C.S. with stooling problems and possible depression, and arranged for counseling. (Id.)

In October 2006, Mr. Spencer brought L.C.S. to Gallahue Mental Health Center due to her fighting with her brother; her preoccupation with sex; and her poor focus, resulting in her refusal to complete tasks. (R. 228, 230-38).   Gallahue social worker, Ms. Andrea Campbell, diagnosed L.C.S. with anxiety disorder not otherwise specified and ruled out a provisional diagnosis of ADHD (Attention-Deficit/Hyperactivity Disorder), inattentive type, and assigned her a GAF score of 50. (R. 227).

One month later, L.C.S. underwent a psychological evaluation at Gallahue. (R. 241-45).   Dr. Dara Josiah-Howze noted that L.C.S.=s history of present illness reportedly

included problems such as: Avivid imagination, sexual talk, acts like baby, foster care duration of three years, living with father for one year, eats a lot, needy and attention seeking.@ (R. 241). The following ADHD symptoms were documented: careless mistakes/decreased attention to detail, problems sustaining attention, does not listen, does not follow through, distracted, forgetful, fidgety, and leaves seat. (<u>Id.</u>)   The doctor also noted that L.C.S. was Adeceitful/stealing.@ (<u>Id.</u>)   No depressive and anxiety symptoms were noted at this time. (R. 241-2).   Dr. Josiah-Howze observed that L.C.S. had fair insight/judgment; appropriate appearance; non-depressed mood; average intelligence; and intact attention, concentration, and memory. (R. 244). She diagnosed L.C.S. with ADHD, inattentive type; an adjustment disorder with mixed disturbance of emotion and obesity; and gave her a good prognosis, recommending continued therapy with Ms. Campbell. (R. 245). She also assigned L.C.S. a GAF score of 50 and prescribed no medication. (<u>Id.</u>) Thereafter, in December 2006, Ms. Campbell maintained the diagnoses and GAF score. (R. 226).

## B.  Treatment in 2007

In January 2007, Mr. Spencer raised a concern about L.C.S.=s weight gain. (R. 214). Dr. Hiller noted that L.C.S. was on the honor roll and was getting counseling through Gallahue Mental Health. (<u>Id.</u>)

In August 2007, L.C.S. turned eight years old.   During her visit with Dr. Hiller, her father reported that she was eating better, and Dr. Hiller recommended a healthy diet and

exercise. (R. 212).   She noted that L.C.S.=s sadness and depression seemed to be
Aresolved@ and that L.C.S. was not currently in counseling. (Id.)   During the same month,
L.C.S. underwent a normal physical exam with consulting physician Dr. Sandeep Gupta,
during which he noted the reported ADHD and depression history, but offered no
diagnosis. (R. 201-03).   On August 31, 2007, consulting psychologist, Carrie Dixon,
Ph.D., conducted a full psychological assessment, including the Childhood Mental Status
Examination as well as performed a clinical interview, a review of available records, and
noted behavioral observations of L.C.S. (R. 206-08).   Dr. Dixon gave no diagnosis. (R.
208).

In September 2007, L.C.S. was seen by Dr. Josiah-Howze for a fifteen-minute
medication management appointment. (R. 240).   She reported that L.C.S. was disruptive,
fidgety, and apparently easily distracted at school, but was completing her class work and
was Adoing okay at home.@ (Id.)   Dr. Josiah-Howze further noted that L.C.S.=s mood was
stable.   Thus, she started her on a daily dosage of fifteen milligrams of Adderall XR, (id.)
having diagnosed L.C.S. with ADHD, predominantly inattentive type, anxiety disorder
not-otherwise-specified, obesity, and assigned her a GAF score of 50. (Id.)   L.C.S. did not
keep an appointment for medication management in October 2007. (R. 239). The progress
note signed by Dr. Josiah-Howze indicates that L.C.S. had not seen a therapist since July
2007. (Id.)

On October 12, 2007, state agency reviewing psychologist Dr. William A. Shipley,

Ph.D., and reviewing physician Dr. G. Wilson, M.D., opined that L.C.S.=s impairments were not severe and did not meet, medically equal, or functionally equal the Listings.   20 CFR Part 404, Subpart P, Appendix 1, Part B. (R. 218-23).   Dr. Shipley and Dr. Wilson indicated that L.C.S. had Ano limitations@ in the following domains of functioning: (#4) moving about and manipulating objects, (#5) caring for self, and (#6) health and physical well-being. (R. 221).   The remaining domains—(#1) acquiring and using information, (#2) attending to and completing tasks, and (#3) interacting and relating with others—were found to be Anot severe@ alone or in combination. (R. 218).   The same month, Ms. Stacey Wemhoff, L.C.S.=s second grade teacher, opined that L.C.S. experienced a Aslight problem@ functioning in four activities under the domain of Ainteracting and relating with others,@ but Ano problem@ in the remaining nine activities. (R. 155).   She found no problems in any activities categorized under the remaining domains. (R. 153-59).   In January 2008, Ms. Wemhoff reported that, after Mr. Spencer began working, L.C.S. was not quite as focused in class, required redirection more often, and seemed a bit more sensitive to redirection. (R. 173).   Still she found L.C.S. to be a very strong, motivated student; and she did not change her prior assessment. (Id.)

On December 18, 2007, Ms. Campbell, M.S.W., L.C.S.W., who is a Gallahue social worker, updated L.C.S.=s diagnosis and treatment plan.    Her report indicates that L.C.S. had been lying, stealing, and experiencing anger outbursts with her siblings. (R. 224).   Ms. Campbell observed that L.C.S. had poor impulse control and judgment, but fair insight,

appropriate appearance and mood, and good concentration and memory. (R. 229).   She maintained Dr. Josiah-Howze=s September 2007 diagnoses and GAF score of 50. (R. 224). Approximately ten days later, Dr. Josiah-Howze reported that L.C.S. had been doing well until she ran out of Adderall; she maintained the same diagnosis and GAF score. (R. 289).

## C.  Treatment in 2008

In January 2008, state agency reviewing psychologist Dr. F. Kladder, Ph.D., and reviewing physician Dr. Steven Roush, M.D., opined that L.C.S.=s impairments were severe but did not meet, medically equal, or functionally equal the Listings. (R. 259). They opined that L.C.S. was less than marked in the domains of (#2) attending and completing tasks and (#3) interacting and relating with others, and had no limitation in the remaining domains:   (#1) acquiring and using information,   (#4) moving about and manipulating objects, (#5) caring for self, and (#6) health and physical well-being. (R. 261-62).

In February 2008, Mr. Spencer reported to Ms. Campbell that L.C.S. was Afailing@ and being disruptive in the classroom. (R. 297).   Her social worker at Gallahue, Ms. Campbell, reported that L.C.S. was happy in mood and affect; however, she was also impulsive and demonstrated poor judgment.   In the same month, another Gallahue social worker, Ms. Jennifer Darce, observed that L.C.S. received a high grade on a test, was praised for her positive work ethic, was exhibiting less controlling behavior, and continued to work on following directions and complying with classroom rules. (R. 304-05).

On March 4, 2008, L.C.S.=s teacher reported to Gallahue social worker, Ms. Jennifer

11

Darce, that L.C.S. recently had to be redirected multiple times and had not taken her medication. (R. 306).   Three days later, Ms. Darce reported that L.C.S. refused to stay in her seat, but had improved behavior despite an increase in her hyperactivity. (R. 307).   On March 11, 2008, L.C.S.=s teacher reported to another Gallahue social worker, Angela Taflinger, that L.C.S. got in trouble for talking and getting out of her seat. (R. 308).   One week later, Ms. Darce reported that L.C.S. showed increased coping skills in dealing with her peers, but a few days later, she observed that L.C.S. displayed negative social skills and impulsive behavior. (R. 310-11, 315-16).

On March 27, 2008, Ms. Campbell completed a status report in which she maintained the same diagnoses and GAF score. (R. 267-73).   Ms. Campbell reported that L.C.S. continued to fight with her siblings and have angry outbursts, but had improved in terms of her lying and stealing. (R. 313).   She opined that the severity of L.C.S.=s condition was Amoderate.@ (R. 267).   She reported that L.C.S.=s symptoms included getting mad easily, being dishonest and noncompliant at times, focusing on women and their looks, and having difficulty with boundaries. (R. 268).   Ms. Campbell also noted that she was concerned about L.C.S.=s aggression, crying, noncompliance, and lack of age-appropriate boundaries. (R. 271).   Ms. Campbell observed that L.C.S. had a quiet and happy mood and appropriate affect, grooming, and conversation skills. (R. 272). She gave L.C.S. a good prognosis with consistent therapy and medication and did not know the duration of her impairments. (Id.)

On April 10, 2008, Ms. Wemhoff reported that L.C.S. struggled with basic directions, lied, and had difficulties with her peers, but was a very strong student and not a Aproblem.@ (R. 320-21).   Five days later, L.C.S. reportedly had difficulty following directions and keeping to herself in class. (R. 323).   On April 24, 2008, L.C.S. reportedly again told several lies to her teacher earlier in the week, but had improved the last few days. (R. 325).

In May 2008, Dr. Josiah-Howze reported that L.C.S. had been out of Adderall since January 2008 and was hyper without it. (R. 329).   In May 2008, Ms. Wemhoff also reported that L.C.S. had struggled with math, but had improved; was very bright and capable; and comprehended at her grade level and read beyond it. (R. 279).   She also reported that L.C.S. could be somewhat domineering and bossy toward classmates, struggled with staying seated and on task, often needed to have directions repeated, sometimes lied, and could be impulsive. (R. 279, 380).   In May 2008, Mr. Spencer reported that L.C.S. was controlling her anger better, but she engaged in impulsive behaviors, such as stealing and lying, and needed prompting to complete her hygiene tasks. (R. 332-36).   Ms. A. Johnson, a Gallahue social worker, maintained the same diagnoses and GAF score. (R. 335).

In June 2008, L.C.S. reportedly had not taken the prescribed Adderall since January 2008, and Ms. Patricia R. Poindexter, M.S.W., C.N.S., reported that she did well on medication. (R. 339).   L.C.S. had difficulty with talking out in class, but was on the honor

roll; she was restarted on Adderall. (R. 339-40).   She also had difficulty with keeping a regular schedule of hygiene/showers. (R. 343).

In September 2008, Ms. Johnson assigned her a GAF score of 55 (R. 350), and Ms. Campbell assigned her a GAF score of 50 (R. 352).

## D.  Treatment in 2009

In January 2009, Betsy Anton, M.A., M.H.C., of Gallahue met with L.C.S., noting that L.C.S.'s Acurrent issues@ were inattention, poor socializing with peers, and hygiene, and that her symptoms affected her Alevel of functioning on a mild-moderate level in all life domains.@ (R. 357).   She diagnosed L.C.S. with a not-otherwise-specified mood disorder, ruled out ADHD and PTSD, and assigned her a GAF score of 60. (R. 354).   On February 13, 2009, L.C.S. reported to Ms. Anton that she attended the school dance, despite not having many friends; that she was picked on at school; and that she wanted a good relationship with her sister. (R. 363-64).   She complained of conflict with her older sister, few friends, lack of interpersonal skills, difficulty focusing, and a history of one instance of sexual abuse. (R. 365).   Ms. Anton noted that L.C.S. had a high functioning level at school; she made the honor roll and had perfect attendance. (Id.)   She noted that L.C.S. would be treated for poor social skills and past trauma. (Id.)   Ten days later, Ms. Anton observed that L.C.S. was easily distracted at an assembly and became agitated when redirected. (R. 366-68).

In March 2009, L.C.S. reported that she was distracted by her classmates and that

14

her older sister continued to be mean to her. (R. 369).   On March 13, 2009, Ms. Anton noted that L.C.S. needed continued treatment for her increased ADHD symptoms and disruptive behavior, and she assigned L.C.S. a GAF score of 60. (R. 369-71).   Three days later, Ms. Anton reported that L.C.S.s ADHD symptoms had improved. (R. 371).   One week later, a male classmate accused L.C.S. of inappropriate touching. (R. 374).   In a March 25, 2009 progress report, Ms. Anton indicated that L.C.S. displayed little progress toward discussing her history of abuse as evidenced by her sexually acting out, but had made some progress in using positive social skills and moderate progress in decreasing her ADHD symptoms. (Id.)   She noted that L.C.S. was not on any medication at the time and assigned her a GAF score of 55. (R. 375).   At the close of her session with L.C.S. that day, Ms. Anton assigned her a GAF score of 58. (R. 376).

At classroom visits in April 2009, Ms. Anton observed that L.C.S. did not sit near many classmates, had a sad mood, had to be redirected, spoke out of turn once, and showed oppositional behavior after being corrected. (R. 389, 392, 397).   At her therapy sessions, L.C.S. reported that she was often redirected for being out of her seat, but had made new friends. (R. 390, 395).   Ms. Anton assigned GAF scores between 58 and 62. (R. 390, 395, 398).

In a May 13, 2009 progress report and the therapy sessions preceding it, Ms. Anton reported that L.C.S. continued to struggle with impulsiveness, keeping focus, and socializing, but made some progress in making friends and moderate progress toward

15

adjusting to her history of sexual abuse, as evidenced by an absence of any reports that she had sexually acted out. (R. 402).   She noted that L.C.S. was not on any medication and assigned her GAF scores of 57 to 60. (R. 400-02).   Two weeks later, Ms. Anton spoke with L.C.S. for approximately ten minutes, (R. 406) after which she reported that L.C.S. continued to act out sexually by saying sexually-worded things to classmates; functioned with mild impairment at home in dealing with her older sister; and continued to do well academically with frequent minor behavioral problems, such as being out of her seat and talking. Id.

In a July 2009 progress report, Ms. Anton reported that L.C.S. had a mostly elevated mood, except when fighting with her sister, continued to struggle with making friends, had not acted out sexually, and made moderate progress in increasing her focus. (R. 408).   Ms. Anton again noted that L.C.S. did not take any medications. Id.

In August 2009, L.C.S. admitted to bullying others, talking, being easily distracted, and reacting impulsively toward classmates, but also reported making more friends in the new school year. (R. 418-22).   L.C.S.=s teacher reported that she had difficulty remaining focused and had been mean to certain classmates, whose parents contacted her. (R. 421). Ms. Anton assigned L.C.S. a GAF score of 55 throughout the month. (R. 412, 420).   On August 25, 2009, L.C.S. saw Doris May, A.P.R.N., for a psychiatric evaluation. (R. 425-30).   Mr. Spencer reported that L.C.S. repeatedly had to be told to do things; the progress note lists that L.C.S. made friends easily and had a best friend, was on the honor

roll, was easily angered or upset, had mood swings with her menstrual period, and had begun eating a great deal. Id.

In September 2009, Mr. Spencer reported that L.C.S. often refused to bathe.   Ms. Anton noted that L.C.S. had a continued need for treatment to address ADHD symptoms and some depressive symptoms. (R. 431).   Later that month, L.C.S. reported having few friends, but that she was getting along better with her sister.   Ms. Anton noted that L.C.S.̓s ADHD symptoms had improved with medication. (R. 433).   L.C.S.̓s teacher reported that, when L.C.S. took her Adderall, she was calm, pleasant, and completed her work; but she was hyper, distracted, and defiant when she did not. (R. 435, 437, 439).

On October 6, 2009, Ms. Anton reported that L.C.S.̓s level of functioning had declined as she struggled with medication compliance. (R. 437-38).   That same day, Nurse May saw L.C.S. for medication management and L.C.S. reported having trouble with focus after missing her medication for a few days. (R. 440).   Nurse May diagnosed L.C.S. with a not-otherwise-specified mood disorder and did not change her GAF score or medication dosage. (R. 440-42).   Ms. Anton̓s GAF scores for L.C.S. increased from a low of 51 to a high of 55 by the end of October, and she repeatedly reported that L.C.S.̓s ADHD symptoms decreased with medication compliance. (R. 437-38, 444, 449).

In November 2009, L.C.S. won a school award for academics and behavior, and Ms. Anton assigned her increasing GAF scores of 59, 60, and 64. (R. 452, 457, 459). L.C.S. reported to Nurse May no trouble at school, and Nurse May did not change L.C.S.̓s

medications or her previous GAF score of 50 on her progress note. (R. 454).   L.C.S. was ten years of age at this time.

### III.   Discussion

Mr. Spencer filed an application for benefits on behalf of his daughter, L.C.S., on June 12, 2007. (R. 10).   A hearing before an ALJ was held on January 25, 2010, at which a board-certified pediatrician, Dr. James Belt, testified as a medical expert. (R. 41-43).   The ALJ denied L.C.S.'s application on April 20, 2010. (R. 7-30) and the national Appeals Council denied L.C.S.'s request for review on February 02, 2011. (R. 1-3).

At the first step, the ALJ found that L.C.S. was not engaged in substantial gainful activity. At the second step, he found that L.C.S. had the following severe combination of impairments: attention-deficit/hyperactivity disorder (AADHD®), mood disorder, and anxiety disorder. (R. 13).   At the third step, he found that L.C.S.=s impairments, individually or in combination, did not meet or medically equal any of the listed impairments.   He evaluated her impairments under the Listings 112.04 (mood disorders), 112.08 (personality disorders), and 112.11 (ADHD). (R. 13-14).   The ALJ also found that L.C.S.'s impairments did not functionally equal any of the Listings. (R. 14-15).   He evaluated the credibility of reports describing the extent of her subjective symptoms according to the SSA's standard. 20 CFR ' 416.929; SSR 96-4p; and SSR 96-7p.   As a result of this evaluation, the ALJ found that L.C.S. had less-than-marked limitations in two of the six domains of functioning and no limitation in the other four.   Because L.C.S. did

not meet or equal any of the Listing, nor did she individually or in combination meet or medically or functionally equal any of the listed impairments, the ALJ found that she was not disabled and thus her application for SSI benefits was denied.  When the Appeals Council denied L.C.S.'s request for review, the ALJ's decision became the final decision of the Commissioner on L.C.S.'s application, which we review here.

Mr. Spencer does not dispute the conclusions reached at step one and step two of the analysis.  At step three, Mr. Spencer asserts four errors in the ALJ's decision:  that the ALJ erred by (1) unfairly ignoring medical evidence; (2) failing to summon a psychologist to testify as to L.C.S.=s mental status and health; (3) ignoring and mischaracterizing treatment evidence which supports L.C.S.=s disability claim, and (4) discounting the credibility of Mr. Spencer=s testimony regarding his daughter=s impairments. We address each of these alleged errors below.


**Fairness.**  Mr. Spencer's initial assertion is that his minor daughter, L.C.S., received Aunfair-unjust treatment,@ and that L.C.S. did in fact meet the criteria for Listing 112.11 (ADHD).   In support of this, he cites Smith v. Secretary of Health, Education and Welfare, 587 F.2d 857 (7th Cir. 1978), a case which reversed a disability denial decision where the claimant was not represented by counsel and where the ALJ failed Ato emphasize the desirability of producing, and to afford an opportunity to produce expert testimony, as to her medical disabilities and their effect on her capacity to engage in any substantial, gainful

work within the meaning of the Act.@ Id. at 860.

In this case, Mr. Spencer=s daughter was represented by counsel and testimony regarding her condition was presented by an expert witness, Dr. James Belt, M.D.   Thus, neither of the circumstances leading to a determination of unfairness in the Smith case inheres to the present situation.   Mr. Spencer had access to the medical expert, Dr. Belt, and Plaintiff's counsel had an unfettered opportunity to question Dr. Belt at the hearing before the ALJ (R . 41-43).   Patrick Mulvany, Plaintiff's attorney, has stipulated that Dr. Belt was Aqualified to testify to psychological issues,@ (R . 41) yet Mr. Mulvany failed to ask Dr. Belt any questions regarding the severity of L.C.S.=s psychological condition, focusing instead solely on the G.A.F. of 50. (R. 43).   Furthermore, the issue of L.C.S.'s inability to be substantially, gainfully employed is not at issue.   As a result, Plaintiff's contention that the ALJ's treatment was unfair is entirely unpersuasive.

Mr. Spencer also fails to explain the relevance of his generalized assertion that Athe decision of the ALJ must be based on consideration of all relevant evidence, and the reasons for his conclusions must be stated >in a manner sufficient to permit an informed review.=@ In Ray v. Bowen, the Seventh Circuit, in ruling that all medical evidence that is Acredible, supported by clinical findings, and relevant to the question at hand should be considered and discussed by the ALJ,@ 843 F.2d 998, 1002 (7th Cir. 1988) (quoting Garfield v. Schweiker, 732 F.2d 605, 609 (7th Cir. 1984)), in effect endorsed Plaintiff's view.   But Mr. Spencer has produced no specifics to support his contention either of

20

unfairness or essential evidence omitted from the ALJ's review.  His broad, sweeping assertions, even when supported by his eight-page enumeration of evidence that he feels was either Aignored or misstated@ by the ALJ, falls short of the mark.  Mr. Spencer=s assertion that L.C.S. meets the criteria of Listing 112.11 (ADHD) is clearly and simply unsupported by the record.   An ALJ is required to provide an Aaccurate and logical bridge= between the evidence and the conclusion that the claimant is not disabled,@ but he is Anot required to mention every piece of evidence.@   Craft v. Astrue, 539 F.3d 668, 673 (7th Cir. 2008) (quoting Young, 362 F.3d at 1002).   The Seventh Circuit has consistently held that an ALJ Aneed only >minimally articulate his or her justification for rejecting or accepting specific evidence of a disability.=@   Rice v. Barnhart, 384 F.3d 363, 371 (7th Cir. 2004) (quoting Steward v. Bowen, 858 F.2d 1295, 1299 (7th Cir. 1988)).   We find that standard satisfied here.

In his findings, the ALJ acknowledged that an age-appropriate review of the criteria listed is essential to properly evaluate disability.   He thus reviewed the diagnostic requirements for Listing 112.11 (ADHD) and drew his conclusions and findings from specific evidence in L.C.S.=s medical record.   When presented with conflicting accounts of L.C.S.'s symptoms, the ALJ considered each account of her abilities and undertook a balanced chronological review of her symptoms. (R. 15-18).   Noting some difficulties in assessing the erratic behaviors of a child diagnosed with ADHD, the ALJ nonetheless concluded that overall L.C.S. experienced Aless than marked@ impairment with regard to

the paragraph B2 criteria applicable to children from three to eighteen: cognitive/communicative function, social functioning, personal functioning, and concentration, persistence, or pace. (R. 13-14).   The ALJ further discussed the conflicting reports of her symptoms in the six functional equivalence domains (R. 18-23) and based his determinations primarily, although not entirely, on the medical record.   The ALJ=s discussion of L.C.S.'s eligibility spans more than ten pages, which includes references to specific portions of L.C.S.=s medical record, Mr. Spencer=s reported concerns, the reports of teachers, the evaluations of four state agency physicians and psychologists, and the direct testimony of both Mr. Spencer and Dr. Belt.   The ALJ also factored into his review multiple sources of medical and psychological evidence, thus satisfactorily fulfilling his obligation to articulate his reasons and draw logical conclusions from available evidence.   We have not been aided in our analysis due to Mr. Spencer's failure to cite any specific evidence to show that L.C.S. meets the criteria in paragraph B2 of Listing 112.02.   In any event, we are not so persuaded in light of our own careful review.

We find no evidence to establish that the ALJ was unfair-unjust in his evaluation of L.C.S.=s behavioral and mental problems or that the ALJ's conclusions were not based on sufficient evidence as compiled in the administrative record.

**Psychological Expert.**   Claimant asserts that the ALJ=s finding that L.C.S.=s impairments did not medically equal any Listing was Abased on [the ALJ's] own layperson=s

22

psychological expertise.@   However, as noted above, the ALJ in fact relied on the evaluations of four state agency physicians and psychologists.   Mr. Spencer=s reference to Barnett v. Barnhart, 381 F.3d 664, 670-71 (7th Cir. 2006); Green v. Apfel, 204 F.3d 780, 781 (7th Cir. 2000); Gudgel v. Barnhart, 345 F.3d 467, 470 (7th Cir. 2003) is inapposite. In Barnett, the court could not locate an agency form, such as a Disability Determination and Transmittal form, that would have satisfied the ALJ=s duty to consider an expert=s opinion on medical equivalence. 381 F.3d at 670-71.   That was not the case here; the state physicians' and psychologists' opinions were clearly documented and accurately referenced.   In Green, the ALJ reached the finding of residual functional capacity solely by considering that the plaintiff=s subjective complaints were disproportionate to the objective medical findings in the record, without consulting *any* apparent medical opinion. 204 F.3d at 781.   Here, the ALJ cites the largely consistent evaluations of state physicians and psychologists. (R. 17).   In Gudgel, the Seventh Circuit ruled that an ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice. 345 F.3d at 470.   Here, again, we find no analogous circumstance; the ALJ has not discounted the opinions of the treating doctors and psychologists.   Finally, an ALJ's decision to consult with psychological experts is discretionary.   20 C.F.R. ' 416.927(f)(2)(iii) (An ALJ may also ask for and consider opinions from medical experts on the nature and severity of a claimant's impairments); Clifford v. Apfel, 227 F.3d 863, 873

(7th Cir.2000).   Therefore, we find no basis on which to credit Mr. Spencer's contention that the ALJ's ruling should be set aside because he supplanted with his own lay knowledge the views of the experts.

Claimant further contends that the ALJ Asimply assumed@ that L.C.S.=s impairments did not medically equal any listing.   In truth, the ALJ, relied on various evidentiary sources, noting conflicts when appropriate.   The differing accounts of L.C.S.=s distractibility between Mr. Spencer and L.C.S.=s teachers (R. 16) as well as Mr. Spencer's descriptions of L.C.S.=s symptoms as Asevere@ during a time when she was not taking her medications regularly (R. 17) were specifically addressed by the ALJ in explaining his decision to rely more heavily on one factor than another competing consideration.   These are not, as Mr. Spencer contends, simple assumptions.   Additionally, as noted by the Commissioner, the ALJ also referenced and relied on the evaluations by the four state agency medical consultants:

> "As for the opinion evidence, I give the most probative weight to the State Agency reviewing physicians and more particularly psychologists…I note the initial assessment opined the claimant had no severe impairment and likely in part based upon Dr. Dixon's psychological consultative examination dated September 5, 2007 which was wholly unremarkable and resulted in no diagnosis…While I do give this evaluation some weight, the evidence developed and submitted subsequent to it suggests at least some limitations.   The State agency reviewing physicians and psychologists upon reconsideration of the new evidence opined the claimant has 'less than marked' limitations in 'attending and completing tasks' (domain II) in addition to 'interacting and relating with others' (domain III).   I concur with this evaluation as well supported by the scholastic and clinical findings."   (R. 17-18).

24

The record clearly establishes through transmittal sheets as well as four state agency reviewing professional opinions an evidentiary basis for the ALJ's determination that L.C.S.˭s impairments did not meet, medically equal, or functionally equal any childhood Listing. (R. 44-46, 218-23, 259-63).   Taken together, there is substantial—indeed compelling—evidence supporting the ALJ˭s finding.

**Interpretation of treatment evidence.**   Mr. Spencer next maintains that the ALJ "ignored and mischaracterized treatment evidence" that if properly considered would prove that L.C.S. met, medically-psychologically equaled, or functionally equaled Listing 112.11 (ADHD).   We share the Commissioner's view that it is Mr. Spencer's burden to show such gaps in the analysis by the ALJ, not merely to provide an enumeration of ignored or misstated evidence.   Ehrhart v. Secretary of Health & Human Services, 969 F.2d 534 (7th Cir. 1992).   Mr. Spencer provides nothing beyond a laundry list of conclusory allegations unsupported by any explanations detailing the ALJ's alleged failure to specifically address each of them.   A "bare listing of evidence not specifically addressed by the ALJ fails to present an issue on review.˭ Poston v. Astrue, 1:08-CV-1543-JMS-LJM, 2010 WL 987734 (S.D. Ind. Mar. 15, 2010) (quoting Reese v. Astrue, 1:07CV1663WTL-JMS, 2009 WL 499601 (S.D. Ind. Feb. 27, 2009)).   Without any cogent analysis, Mr. Spencer has effectively foreclosed meaningful review by the court.   Whitlow v. Astrue, 2009 WL 648602, 8 (S.D.Ind. March 10, 2009).

We hold that the ALJ neither ignored nor mischaracterized treatment evidence that would have proven that L.C.S. met, medically-psychologically equaled, or functionally equaled Listing 112.11 (ADHD).

**Credibility of Mr. Spencer's statements.**   Mr. Spencer's final assertion is that the ALJ's credibility determination is "patently erroneous" because it is contrary to Social Security Ruling 96-7p.   He argues that the ALJ rejected or ignored all evidence of L.C.S's "nonexertional impairments of hyperactivity-inattention-anxiety-depression mental disorders" in a "perfunctory and vague" fashion.   The record, properly considered, indicates otherwise.   The ALJ discussed the varying symptoms that L.C.S. experienced, including the duration and intensity of her ADHD and anxiety. (R. 16).   He reviewed the treatment record beginning in 2006 noting that L.C.S was diagnosed with "anxiety disorder *ruling out ADHD* and a GAF of 50, indicative of 'serious' impairment," contrasting this with Mr. Spencer's claim that L.C.S. had an onset of disability in April 2006.   He also observed that L.C.S. was treated on only four occasions during 2006. (R. 15).   The ALJ discussed the 2007 treatment that L.C.S. received from Dr. Dixon and the "State Agency reviewing physician and psychologist concluded that the claimant had no severe impairments." (R. 16).   In addition, the ALJ also noted differences in behavior and function while she was using her prescribed medication consistently and when she was not. (R. 17).   When L.C.S. was prescribed Adderall and began taking it on a regular basis,

L.C.S.'s teacher described her behavior problems as "only slight" in the area of interacting and relating to others. (R. 16).   The ALJ gave balanced and detailed consideration to the record and his conclusions again were supported by substantial evidence.

Mr. Spencer's related assertion that the ALJ failed to comply with Social Security Ruling 96-7p in rejecting the low GAF score of 50 is similarly unavailing.   Concurrent with the low GAF of 50, the ALJ considered the numerous reports of teachers, doctors, social workers, and therapists, whose accounts on the whole differed greatly from those of Mr. Spencer.   The ALJ noted that this difference in accounts between everyone else and Mr. Spencer created a "clear pattern:"   Mr. Spencer would report troubles at home, while others would report moderate concerns, mild concerns, or no concerns. (R. 16).   The ALJ addressed "the static nature of the claimant's GAF scores despite what appears to be a mild to moderate condition which is improved with medications." (Id.)   The ALJ additionally noted "the consistent GAF scores of 50 within a large portion of the treatment notes by the Gallahue staff," contrasting it with the additional scores ranging from 55 to 60:

> "Based upon the higher scores and in combination with the evaluations and observations of claimant's teacher (Ms. Wemhoff) and the claimant's grades/achievements I conclude that the claimant's condition is not "serious," i.e., worthy of a GAF of 50. In addition, I note that no treating psychologist or physician has opined the claimant is disabled." (R. 18).

L.S.C.'s father appears to accord greater weight to the GAF score than to the reports of the health care providers and teachers.   Such analytical differences do not establish error, however, on the part of the ALJ.   We conclude that the record amply demonstrates that the

ALJ's decision was supported by substantial evidence.

## IV.   Conclusion

Because the Commissioner=s decision is supported by substantial evidence as detailed in the record and no legally cognizable error affected the Commissioner's determinations, the denial of Mr. Spencer=s application for benefits on behalf of his daughter, L.C.S., must be and is hereby AFFIRMED.

IT IS SO ORDERED.

Date:  09/06/2012

_Sarah Evans Barker_

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

**Patrick Harold Mulvany**
2506 Willowbrook Parkway
Suite 201
Indianapolis, IN 46205
(317)253-8659
Fax: (317) 253-8676
patrick@mulvanylaw.com

**Thomas E. Kieper**
UNITED STATES ATTORNEY'S OFFICE
10 West Market Street
Suite 2100
Indianapolis, IN 46204
(317) 226-6333
Fax: (317) 226-6125
tom.kieper@usdoj.gov

28